IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 21-91-2 |
| | : | |
| ANGEL RAFAEL REYES-VALDEZ | : | |

**<u>MEMORANDUM</u>**

**Padova, J.**                                                      **September 6, 2023**

Defendant Angel Rafael Reyes-Valdez has filed a Motion to Suppress, seeking to suppress evidence seized during a search conducted at 4243 Hellerman Street in Philadelphia after he was taken into custody on October 28, 2020. He argues that the search and seizure violated his rights under the Fourth Amendment because law enforcement officers searched the property without first obtaining either a warrant or his actual and voluntary consent. He also seeks to suppress a statement he made to a law enforcement officer after he was taken into custody on the ground that the statement violated his rights under the Fifth Amendment because the officer took the statement without first advising him of his <u>Miranda</u> rights. We held a Hearing on the Motion on August 29, 2023. For the reasons that follow, we grant the Motion in part and deny it in part.

**I.     BACKGROUND**

    A.     <u>The Indictment</u>

Count One of the Indictment in this case charges Defendant Reyes-Valdez and his Co-Defendant Gabriel Rivera-Otero with knowingly and intentionally possessing with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, on October 28, 2020, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2. Count Three of the Indictment charges Defendant with

knowingly and intentionally possessing with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, on October 28, 2020, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).  Counts One and Three also charge that Defendant had a previous conviction for a serious drug felony before he committed the offenses charged in those Counts, namely, a June 9, 2005 conviction in the United States District Court for the Eastern District of Pennsylvania for conspiracy to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 84l(a)(l), (b)(l)(A) and 846, for which he served more than 12 months of imprisonment.  Count Five of the Indictment charges Defendant with managing and controlling a residence located at 4243 Hellerman Street in Philadelphia on October 28, 2020, that was used "for the purpose of unlawfully manufacturing, storing and distributing a controlled substance, that is, heroin, a Schedule I controlled substance, and [fentanyl], a Schedule II controlled substance" in violation of 21 U.S.C. § 856(a)(2).  Count Seven of the Indictment charges Defendant with reentry into the United States without first obtaining the permission of the Attorney General and his successor, the Secretary for Homeland Security, after having been deported from the United States on January 24, 2007, February 7, 2013, and July 15, 2014, in violation of 8 U.S.C. § 1326(a), (b)(2).

     B.   <u>Findings of Fact</u>

We find the following facts based on the testimony and exhibits introduced into evidence during our August 29, 2023 hearing.[1]  Officer Efran Torres is employed by the City of Philadelphia Police Department and has been assigned to the Drug Enforcement Administration ("DEA") Task Force Group 25 for ten years.  (8/29/23 Hr'g Tr. at 8.)  This Task Force

---

[1]  In finding these facts, we credit the testimony from the Government's witnesses at the August 29, 2023 Hearing, all of whom were credible.  Defendant did not call any witnesses or submit any evidence during the Hearing.

investigates narcotics suppliers.  (<u>Id.</u> at 8-9.)  Officer Torres is a native speaker of both English and Spanish.  (<u>Id.</u> at 9.)  On October 28, 2020, he and other members of the Task Force were in the area of 4640 Roosevelt Boulevard in Philadelphia for a "kilo rip."  (<u>Id.</u> at 10.)  Specifically, they were in communication with a suspect, known as "Gustavo," who had offered to bring them six kilograms of cocaine/heroin.  (<u>Id.</u>)  Officer Torres identified "Gustavo" as Gabriel Rivera-Otero, who is also charged in this case.  (<u>Id.</u> at 11.)  Defendant was seen walking and talking with Co-Defendant Rivera-Otero at the place where the exchange of narcotics was supposed to take place, and they were taken into custody together.  (<u>Id.</u> at 15.)  At the time, Defendant had a Ford Escape.  (<u>Id.</u> at 15-16.)

The Task Force Officers brought both Defendant and Rivera-Otero from the parking lot at 4640 Roosevelt Boulevard across the street to the parking lot of the Friends Hospital.  (<u>Id.</u> at 16.)  Officer Torres spoke with Defendant in Spanish in the parking lot of the Friends Hospital. (<u>Id.</u>)  Officer Torres looked at Defendant's identification, which was a driver's license from the Dominican Republic in the name of Elvis Santos Paredes.  (<u>Id.</u> at 16-18; Ex. 8G.)  During the Hearing, Officer Torres confirmed that the photograph on the license appeared to be a photograph of Defendant.  (<u>Id.</u> at 18.)

While Officer Torres was speaking with Defendant, another Officer in the Task Force contacted Agent Darmody of Homeland Security to check Defendant's identity.  (<u>Id.</u> at 19.) Defendant then gave Officer Torres another name, which Officer Torres gave to Homeland Security Agent Darmody.  (<u>Id.</u>)  Agent Darmody used the two aliases that had been provided by Defendant, as well as the driver's license, to find an identification for Defendant in Homeland Security's database.  (<u>Id.</u>)  Officer Torres then asked Defendant if his name was Angel Reyes-Valdez and if he had ever been arrested.  (<u>Id.</u>)  Defendant confirmed that his name is Angel

Reyes-Valdez and that he had been arrested by the DEA in 2004. (Id.) Defendant also told Officer Torres that he had been previously deported, which Agent Darmody confirmed. (Id. at 20.)

Officer James Chabot is a Philadelphia Police Officer who has been assigned to the DEA Task Force with Group 32 for four years. (Id. at 35-36.) In September of 2020, he participated in an investigation of a large-scale money laundering operation in Philadelphia with DEA Task Force Group 51. (Id. at 37.) Agent Romig, who has been with the DEA since 2008, was the Group Supervisor of Group 51 in September and October 2020. (Id. at 57-59.) In mid-September 2020, Group 51 was investigating a large-scale Mexican money laundering operation. (Id. at 59.) Officer Chabot was responsible for street surveillance of "targets, addresses, locations, and pickup and drop off points" for Group 51. (Id. at 37.) In a money laundering pickup, the Task Force utilizes a confidential informant ("CI") to transfer money to or from another person. (Id. at 37-38.) After the money pickup is completed, Officer Chabot conducts surveillance of the individual with whom the CI conducted the pickup. (Id. at 39.) On September 16, 2020, he conducted surveillance in connection with the money laundering investigation. (Id.) During that surveillance, he saw Defendant driving a gray 2009 Ford Escape with a white stuffed monkey on the dashboard. (Id. at 39-41; Ex. 8A.) Defendant gave the CI just over $220,000 in currency. (Id. at 42.) Officer Chabot then followed Defendant, who was in the Ford Escape, to 4243 Hellerman Street. (Id.) Officer Chabot periodically conducted surveillance at that address after September 16, 2020, and saw a gray 2009 Ford Escape in the vicinity of that address on several occasions. (Id. at 44.)

Officer Chabot was part of the Task Force's October 28, 2020 operation at 4640 Roosevelt Boulevard. (Id. at 45.) He and his partner, Officer Corvi, were wearing police

uniforms and were there in a marked Philadelphia Police Department vehicle.  (Id. at 45-46.)  He and his partner were close to the location in which "Gustavo" was supposed to transfer the six kilograms of controlled substances.  (Id. at 45.)  Officer Chabot saw Defendant and his vehicle in the parking lot of 4640 Roosevelt Boulevard.  (Id. at 47-48.)  Officer Chabot recognized Defendant and his vehicle from the money laundering operation approximately six weeks before.  (Id. at 48.)  There was still a monkey on the dashboard of the Ford Escape.  (Id.)  Officer Chabot notified the individual supervising the Task Force's operation that Defendant and the Ford Escape had been involved in a money pickup several weeks before.  (Id. at 48-49.)  Officer Chabot then contacted another agent from Task Force Group 51 to let Group 51 know that he and other agents would be taking Defendant to 4243 Hellerman Street in an attempt to get consent to search that property.  (Id. at 49-50.)  Officer Chabot later drove Defendant to 4243 Hellerman Street.  (Id. at 50.)

When they arrived at 4243 Hellerman Street, two other Agents, Romig and Espinal, knocked on the door of the residence.  (Id. at 51.)  Agent Romig went to 4243 Hellerman Street after he learned that Defendant was in custody in order to search the premises because he believed there might be a substantial amount of drug money in that house.  (Id. at 60-62.)  Agent Espinal, who is a native Spanish speaker, has been with the DEA for about five years and, in October 2020, was working with Group 51 under the Supervision of Agent Romig.  (Id. at 63-64, 78-79.)  After Agent Romig and Agent Espinal approached the residence and knocked on the door, a woman came to the door and looked out the front window.  (Id. at 64.)  Agent Romig held up his badge and identified himself and Agent Espinal as police officers.  (Id.)  The woman walked away from the door without speaking.  (Id.)  Agent Romig knocked on the door again and a young man later identified as Nelfie came to the door.  (Id. at 65.)  Nelfi also turned and

5

walked away without opening the door.  (Id.)  The Agents also noticed someone at a second-floor window.  (Id. at 51.)  At this point, Agent Romig had Officer Corvi who, unlike Agent Romig, was in uniform, come to the door and knocked on the door again.  (Id.)  Nelfie then opened the door for them and walked into the house.  (Id.)  Nelfi left the door open, and Agent Romig, Agent Espinal, and Officer Corvi followed him into the house.  (Id. at 52, 65-66.)  Officer Corvi and a couple of other Agents performed a protective sweep of the residence to make sure that there was no one else in the house.  (Id. at 68.)

After they entered the house, Agents Romig and Espinal asked Nelfie whether they could search the house for drugs or drug proceeds.  (Id. at 69.)  Nelfi told them that he was not the owner of the house, that he was just visiting, and that he could not authorize a search of the house.  (Id.)  They showed Nelfi a picture of Defendant.  (Id. at 70.)  Nelfie identified the photo as a picture of the owner of the residence.  (Id. at 80-81.)  Nelfi told them that Defendant could consent to the search.  (Id. at 70.)

Officer Chabot subsequently brought Defendant, who was handcuffed, inside the house and took him into the kitchen, where they met with Agents Romig and Espinal.  (Id. at 52,70-71.)  Officer Chabot went back outside.  (Id. at 52-53.)  Agent Espinal then asked Defendant, in Spanish, to consent to a search of the premises.  (Id. at 70, 80.)  Agent Espinal gave Defendant a Spanish language DEA consent to search form, Ex. 12B.  (Id. at 82.)  She read the form to him in Spanish.  (Id. at 72, 82-83.)  She wrote the address of the residence on the consent to search form in Defendant's presence.  (Id. at 83.)  Defendant's handcuffs were removed so that he could sign the Spanish language consent to search form.  (Id.; Ex. 12B.)  Defendant initialed the form next to the address to confirm that it was the correct address and that he was consenting that a search be conducted of that residence.  (Id.)  The form asks whether the person signing it is being forced

to sign it and Defendant wrote no, indicating that he was not being forced.  (Id. at 83-84.)  The

form also asks whether the person signing the form freely consents to the search.  (Id. at 84.)

Defendant wrote "si," meaning yes.  (Id.)  Defendant also signed the form, which was dated

October 28, 2020.  (Id.)  Agent Espinal watched Defendant sign the form and she also signed it.

(Id.)  Special Agent Brian Sartor witnessed their signatures.  (Id.)

Agent Espinal believes that Defendant signed the consent to search form of his own free

will.  (Id. at 85.)  After Defendant signed the form, the residence was searched.  (Id. at 74, 86.)

During the search, drugs were recovered in the basement of the residence, a firearm was found in

the front bedroom on the second floor, and money was recovered in a suitcase in the back

bedroom on the second floor.   (Id.)   Agents found $90,000 in cash in the suitcase, and

approximately 30 kilograms of fentanyl in the basement.  (Id. at 74.)  Agent Espinal asked

Defendant who the money belonged to, and he said that he was the owner.  (Id.)  Defendant

signed the evidence bag in which the money had been placed.  (Id. at 88.)

## II.      THE SEARCH OF 4243 HELLERMAN STREET

### A.  Standing

The Government asks us to dismiss the Motion to Suppress with respect to the search of

4243 Hellerman Street on the ground that Defendant has not satisfied his burden of establishing

that he has standing to challenge the search.  The Fourth Amendment states that "[t]he right of

the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.  "An individual

challenging a search has the burden of establishing that he had a reasonable expectation of

privacy in the property searched and the item seized."  United States v. Burnett, 773 F.3d 122,

131 (3d Cir. 2014) (citing Minnesota v. Olson, 495 U.S. 91, 95-97 (1990)).  "A person must

show both that he had a subjective expectation of privacy in the area searched and that his expectation was objectively reasonable." Id. (citing Rakas v. Illinois, 439 U.S. 128, 143-44 (1978); United States v. Donahue, 764 F.3d 293, 298-99 (3d Cir. 2014)).

The Government maintains that Defendant has not established that he had a subjective expectation of privacy at 4243 Hellerman Street and has not met his burden of establishing standing.  As we noted above, Defendant did not present any evidence during the August 29, 2023 Hearing.  See supra note 1.  He relies on the evidence submitted by the Government to show that he has standing to contest the legality of the search.  (See Docket No. 107.)  The Government acknowledges that the testimony admitted into evidence during the Hearing shows that Agents conducted surveillance and observed Defendant park his car near 4243 Hellerman Street and enter that residence.  The Government maintains, though, that this evidence is not enough to establish that Defendant had an expectation of privacy inside 4243 Hellerman Street.  See United States v. Nole, Crim. A. No. 06-066-02, 2006 WL 2085989, at *3 (E.D. Pa. July 25, 2006) (noting that simply entering a residence momentarily does not create an expectation of privacy in that residence).

However, that was not the only evidence admitted during the Hearing regarding Defendant's interest in 4243 Hellerman Street.  Agent Romig testified that Nelfi saw the picture of Defendant and said that the pictured individual could consent to the search of the residence.[2] (8/29/23 Hr'g Tr. at 70.)  Agent Espinal testified that Nelfi "positively ID[ed] Mr. Reyes as the owner of that residence."  (Id. at 81.)  Agent Espinal also testified that Defendant told her that he was the owner of the $90,000 in cash that was recovered from a suitcase in a second-floor

---

[2] "For purposes of a motion to suppress, the court 'may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.'"  United States v. Brooks, 358 F. Supp. 3d 440, 447 n.2 (W.D. Pa. 2018) (quoting United States v. Raddatz, 447 U.S. 667, 679, (1980)) (citing Brosius v. Warden, 278 F.3d 239, 246 (3d Cir. 2002)).

bedroom of 4243 Hellerman Street.  (Id. at 87.)   In addition, Defendant signed the self-sealing evidence bag in which that money was placed, to indicate that he owned the currency.  (Id. at 86-88; Ex. 11N.)   We conclude that this testimony is sufficient to establish that Defendant has a reasonable expectation of privacy in 4243 Hellerman Street and therefore has standing to challenge the search and seizure.  See Burnett, 773 F.3d at 131 (citation omitted).

      B.  Consent

      Defendant argues that we should suppress all of the physical evidence seized from 4243 Hellerman Street because the Task Force Officers who seized that evidence violated his Fourth Amendment rights by conducting a warrantless search of that residence without his voluntary consent.  "'Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause.'"  United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)).  However, "[i]t is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citations omitted).

      The Government argues that we should deny the Motion with respect to the search of 4243 Hellerman Street because Defendant voluntarily consented to the search of that residence.  "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.  This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968) (citations and footnote omitted).  "'[W]e determine the voluntariness of a consent by examining the totality of the circumstances.'"  United States v. Stabile, 633 F.3d 219, 231 (3d Cir. 2011) (alteration in original) (quoting United States v. Price,

558 F.3d 270, 278 (3d Cir. 2009) (citing Schneckloth, 412 U.S. at 227).  "We consider such factors as 'age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment.'"  Id. (quoting Price, 558 F.3d at 278) (citing Schneckloth, 412 U.S. at 226).  "The 'setting in which the consent was obtained [and] the parties' verbal and non-verbal actions' are also relevant."  Id. (alteration in original) (quoting Price, 558 F.3d at 278) (internal quotation omitted).  We consider these factors in turn.

       1.    Defendant's age, education, and intelligence

In this case, we have no evidence regarding Defendant's age, education or intelligence. We do have evidence that he speaks only Spanish, but there is also evidence that the consent to search form that Defendant signed was printed in Spanish and that Agent Espinal read it to him in Spanish. (See 8/29/23 Hr'g Tr. at 82-83; Ex. 12B.)  Defendant did not ask Agent Espinal any questions about the consent to search form.  (Id. at 83.)  He also initialed the residence address on the consent to search form, wrote "no" in response to question 2 of the form, which asked if he was being forced to give his consent to the search, and wrote si in response to question 3 of the form, which asked if he freely gave his consent to the search.  (Id. at 83-84.)  Defendant also signed the form.  (Id. at 84.)  We find, based on the evidence before us, that Defendant was able to understand the questions presented on the Spanish version of the consent to search form and was able to respond intelligently to those questions.  We therefore conclude that this factor weighs in favor of a conclusion that his consent to the search of 4243 Hellerman Street was voluntary.

2.    <u>Whether Defendant was advised of his constitutional rights</u>

There is no evidence that Defendant was advised of his constitutional rights before he was asked to consent to the search of 4243 Hellerman Street.  However, "'consent to search can be voluntary—and therefore Fourth–Amendment–compliant—notwithstanding the fact that it was given while a defendant was in custody without having received <u>Miranda</u> warnings.'" <u>United States v. Brown</u>, 627 F. App'x 163, 166-67 n.4 (3d Cir. 2015) (quoting <u>United States v. Renken</u>, 474 F.3d 984, 987-88 (7th Cir. 2007)) (citation omitted).  Defendant argues that his consent was not voluntary because he was not informed of his right to refuse consent.  However, he has presented no evidence to support this argument and Agent Espinal testified that she advised Defendant that he had the right to refuse consent.  (8/29/23 Hr'g Tr. at 88-89, 92.)  Since there is no requirement that Defendant be advised of his <u>Miranda</u> rights before being asked to consent to the search of 4243 Hellerman Street, and because the only evidence presented was that he was advised that he had the right to refuse to give consent to the search of that property, we conclude that this factor weighs in favors of a conclusion that he voluntarily consented to the search of 4243 Hellerman Street.

3.    <u>Length of the Encounter and Repetition or Duration of Questioning</u>

Officer Torres testified that Defendant was taken into custody by Agents at 4640 Roosevelt Boulevard at 1:03 p.m. on October 28, 2020.  (8/29/23 Hr'g Tr. at 14-15.)  Officer Torres subsequently spoke with Defendant in the Friends Hospital parking lot for approximately five to ten minutes.  (<u>Id.</u> at 20.)  Officer Chabot later drove Defendant to the vicinity of 4243 Hellerman Street, a 20 minute drive.  (<u>Id.</u> at 50.)  Officer Chabot did not speak to Defendant during that drive.  (<u>Id.</u>)  At 3:35 p.m. that afternoon, Agents Romig and Espinal arrived at 4243 Hellerman Street.  (<u>Id.</u> at 79.)  They spoke to Nelfi right after they arrived, and Defendant was

11

brought into the kitchen of that residence shortly thereafter.  (<u>Id.</u> at 81.)  Agent Espinal then gave

Defendant the Spanish language consent to search form and read and reviewed that form with

him in Spanish.  (<u>Id.</u> at 81-84.)  It took Agent Espinal no more than five minutes to review the

consent to search form with Defendant.  (<u>Id.</u> at 85.)  We find that Defendant was in custody for

approximately three hours before he signed the consent to search form and was questioned about

that form for approximately five minutes, after being questioned for five to ten minutes shortly

after being taken into custody.  Defendant does not contend that he was subjected to lengthy

custody or to repeated or lengthy questioning before signing the consent to search form.  Since

Defendant does not claim to have been subjected to lengthy custody or to repeated or lengthy

questioning before he signed the consent to search form, we conclude that this factor weighs in

favor of finding that he voluntarily consented to the search of 4243 Hellerman Street.

### 5.    The Use of Physical Punishment

Defendant does not contend that any of the law enforcement Officers and Agents used

physical punishment to obtain his consent to search his properties.   Moreover, Agent Romig

testified that no one threatened Defendant or spoke to him in a threating manner.  (<u>Id.</u> at 73.)  We

conclude, accordingly, that this factor favors a finding that Defendant voluntarily gave his

consent to the search.  <u>See</u> <u>United States v. Hovan</u>, Crim. A. No. 20-254-1, 2021 WL 3771811,

at *6 (E.D. Pa. Aug. 24, 2021) (finding that "[t]he fourth factor – 'the use of physical

punishment' – weighs in favor of voluntariness" where the defendant did not "allege–and the

record does not suggest–that the special agents used force or physical intimidation").

### 6.    The Setting in Which Consent Was Obtained

Defendant was taken into police custody placed in handcuffs in the parking lot of 4640

Roosevelt Boulevard at approximately 1:03 p.m. (8/29/23 Hr'g Tr. at 10, 25.)  He remained in

custody and in handcuffs until he was asked to sign the consent to search form in the kitchen of 4243 Hellerman Street.. (Id. at 71.)  His handcuffs were removed so that he could sign the form. (Id.)  However, "'the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search.'"  Hovan, 2021 WL 3771811, at *6 (alteration in original) (quoting United States v. Watson, 423 U.S. 411, 424 (1976)); see also United States v. Kellam, 751 F. App'x 184, 189 (3d Cir. 2018) (concluding that the district court correctly found that the defendant voluntarily consented to the search of his residence after considering the totality of the circumstances even though the defendant "was in custody and surrounded by law enforcement authorities" when he was asked to consent); United States v. Ortiz, 483 F. App'x 712, 716 (3d Cir. 2012) (affirming district court holding that defendant voluntarily consented to the search of his home and garage even though he was handcuffed at the time he gave his consent).  We conclude that the fact that Defendant was in custody and in handcuffs at the time he signed the consent to search form and gave his consent for the search of 4243 Hellerman Street does not weigh against a finding of voluntariness.

Having weighed all of the factors listed in Stabile, 633 F.3d at 231, for determining whether consent to search was given voluntarily, we conclude that those factors weigh in favor of a finding that Defendant voluntarily gave his consent to the search of 4243 Hellerman Street.

7.    The protective sweep

Defendant also argues that we should grant the Motion to Suppress because law enforcement officers conducted a protective sweep of 4243 Hellerman Street before he was brought to the residence and gave his consent to search.  Special Agent Kyle Boyd, who works with the Pennsylvania Attorney General's office, testified at the Hearing that he was present at 4243 Hellerman Street at 3:35 p.m. on October 28, 2020.  (8/29/23 Hr'g Tr. at 95-96.)  He went

to 4243 Hellerman Street with Agents Romig and Espinal.  (Id. at 96.)  He entered the residence with them and conducted a protective sweep of the basement of the residence while they were in the kitchen.  (Id. at 97-98.)  He conducted the protective sweep because Agents Romig and Espinal were unprotected, i.e., they were not wearing protective vests, and they did not know what could be in the residence.  (Id. at 98.)  Agent Boyd believed, based on his experience, that residences "associated with high level narcotics trafficking usually have firearms and or individuals that are willing to protect that residence."  (Id.)  In addition, before he entered 4243 Hellerman Street, Agent Boyd saw curtains moving in a second-floor window and saw an individual behind the curtains.  (Id.)

The residence has two upper floors and a basement.  (Id. at 99.)  The basement has a bathroom, a closet and a bar.  (Id.)  Agent Boyd believed that a person could hide behind the bar. (Id. at 101.)  Once he was in the basement, Special Agent Boyd saw, in plain sight, a narcotics packaging table, a clear glass table under a heat lamp, and numerous kilogram size cellophane objects behind the bar.  (Id. at 99.)  Special Agent Boyd also saw an open suitcase on the floor behind the bar that appeared to contain a kilogram size package.  (Id. at 101.)

In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court held that law enforcement officers could conduct a warrantless protective sweep of a home in two scenarios.  Under the first scanrio, incident to an arrest, "'an officer [can], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'"  United States v. White, 748 F.3d 507, 511 (3d Cir. 2014) (quoting Buie, 494 U.S. at 334).   Under the second scenario, an officer can conduct a warrantless search if there are "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer

in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" Id. (quoting Buie, 494 U.S. at 334).  "Under either [scenario], the sweep must be 'narrowly confined to a cursory visual inspection of those places in which a person might be hiding' because the purpose for a protective sweep is to 'protect the safety of police officers or others.'"  United States v. Guerrier, No. 21-1725, 2021 WL 5822394, at *2 (3d Cir. Dec. 6, 2021) (quoting Buie, 494 U.S at 327)1), cert. denied, 142 S. Ct. 1460 (2022).

Here, Special Agent Boyd testified that he conducted the protective sweep because Agents Romig and Espinal were unprotected, he saw an unidentified individual on the second floor of the residence before he entered, and he believed, based on his experience, that there could be individuals with firearms in the residence who were prepared to protect the residence. (8/29/23 Hr'g Tr. at 96-98.)  Special Agent Boyd also testified that he only looked at items in plain view and in places where people could be hiding; he did not look in drawers or places where people could not hide until after Defendant gave his consent for the search.  (See id. at 100 (stating that he did not open a drawer and look inside it during the protective sweep); and 102 (stating that he did not check behind ceiling tiles during the protective sweep because no one could hide in the ceiling).)

We conclude, based on the evidence submitted during the Hearing, that the protective sweep was justified under the second scenario described in Buie and did not exceed the limitations placed on such a sweep by Buie.  Thus, we deny the Motion to Suppress to the extent that Defendant argues that we should suppress the evidence seized by law enforcement during their search of 4243 Hellerman because law enforcement conducted a protective sweep of that residence before Defendant gave his consent for the search.  Accordingly, we deny the Motion to

Suppress with respect to Defendant's argument that the warrantless search of 4243 Hellerman Street violated the Fourth Amendment because it was conducted without his consent.

## III.    DEFENDANT'S STATEMENTS

### A.    Legal Standard

Defendant argues that we should suppress the statement he made to Officer Torres about his prior deportation on the ground that the statement was taken in violation of his rights under the Fifth Amendment.  "The Fifth Amendment provides that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'"  United States v. Drummond, 482 F. App'x 686, 690 (3d Cir. 2012) (alteration in original) (quoting U.S. Const. amend. V).  "[T]he Supreme Court in Miranda 'presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forgo those rights.'" Id. (quoting New York v. Quarles, 467 U.S. 649, 654 (1984)). "The 'Miranda rights,' while not constitutionally compelled, have a 'constitutional underpinning,' and thus, they may not be rescinded by an act of Congress or be treated with anything but the most scrupulous regard by a reviewing court."  Id. (quoting Dickerson v. United States, 530 U.S. 428, 440 n.5 (2000)).  The Supreme Court held in Miranda that before questioning, a person must be given the following warnings:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda v. Arizona, 384 U.S. 436, 479 (1966).

The Government argues that Defendant's statements to police regarding his citizenship and prior deportation should not be suppressed because they fall under an exception to Miranda.

16

"In <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601 (1990), a plurality of the Supreme Court stated that <u>Miranda</u>'s coverage does not extend to 'routine booking' questions asked to secure 'biographical data necessary to complete booking or pretrial services.'"   <u>United States v. Carvajal-Garcia</u>, 54 F. App'x 732, 738 (3d Cir. 2002); <u>see also</u> <u>United States v. Mercedes</u>, 69 F. App'x 38, 41 (3d Cir. 2003) (noting that "questioning regarding only biographical data" does not trigger <u>Miranda</u> (citing <u>Muniz</u>, 496 U.S. at 601-02; add'l citation omitted).   Thus, pursuant to <u>Muniz</u>, "booking questions regarding 'name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation' unless the questions are 'designed to elicit incriminatory admissions.'"   <u>United States v. Kent</u>, Crim. A. No. 18-417, 2021 WL 816905, at *4 (E.D. Pa. Mar. 3, 2021) (quoting <u>Muniz</u> 496 U.S. at 601 & n.14) (citation omitted)).

Defendant argues that Officer Torres did not merely ask him routine booking questions, but also asked him about his immigration status.  Defense counsel asked Office Torres on cross-examination whether Defendant's "statement that he was previously deported was in response to questions that you were asking him relative to his identity and immigration status."  (8/29/23 Hr'g Tr. at 29.)   Officer Torres answered affirmatively.  (<u>Id</u>.)  However, any questions that Officer Torres may have asked Defendant regarding his immigration status would not have been routine booking questions subject to the exception to <u>Miranda</u> for questions regarding "'biographical data necessary to complete booking or pretrial services.'"  <u>Carvajal-Garcia</u>, 54 F. App'x at 738.   Accordingly, we grant the Motion to Suppress regarding any statements Defendant may have made regarding his immigration status and any evidence of those statements is hereby suppressed.

**IV.     CONCLUSION**

For the reasons stated above, we grant the Motion to Suppress with respect to evidence of any statements that Defendant made regarding his immigration status while he was being questioned by Officer Torres after being taken into custody on October 28, 2020.  We deny the Motion with respect to the evidence seized during the search of 4243 Hellerman Street.  By agreement of the parties, we also bifurcated the trial so that Count Seven will be tried after the jury has rendered its verdict with respect to the remaining Counts of the Indictment.[3]  An order follows.

BY THE COURT:

/s/ John R Padova

_____

John R. Padova, J.

_____

[3] Defendant initially asked, in the Motion to Suppress, that we sever the trial of this action as to Count Seven, which charges him with reentering the United States without the permission of the Attorney General and his successor, the Secretary for Homeland Security, after having been previously deported from the United States.  Defendant asked us to sever this Count from the remaining charges against him because trying him on this Count along with the other charges would prejudice the jury against him.  The parties notified us during our Final Pretrial Conference that they have agreed to remedy that potential prejudice by bifurcating the trial and waiting to admit evidence as to Count Seven until after the jury has rendered its verdict with respect to the remaining Counts of the Indictment.  We accept the parties' proposal and bifurcate the trial as to Count Seven.