IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :          CRIMINAL ACTION
                              :
          v.                  :
                              :
ANGEL RAFAEL REYES-VALDEZ     :          NO. 21-91-2


MEMORANDUM

Bartle, J.                                    July 10, 2024

Before the court is the motion of Defendant Angel
Rafael Reyes-Valdez ("Valdez") "for reconsideration of [his]
motion to suppress evidence obtained in violation of his Fourth
Amendment rights."

Valdez and his Co-defendant Gabriel Rivera-Otero
("Otero") have been indicted on one count jointly for possession
with intent to distribute over 6,000 grams of fentanyl in
violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and aiding and
abetting in violation of 18 U.S.C. § 2.  Each Defendant also
faces an additional separate count for possession with intent to
distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and
(b)(1)(A).  The indictment further charges each Defendant with
managing a residence for the purpose of manufacturing, storing,
and distributing heroin and fentanyl in violation of 21 U.S.C.
§ 856(a)(2).  Finally, Valdez is charged with illegal reentry

into the United States in violation of 8 U.S.C. §§ 1326(a) and (b)(2).[1]

The indictment was filed on March 17, 2021.  For various compelling reasons, including the withdrawal of defense counsel, the trial has been delayed until July 15, 2024.

Valdez seeks to relitigate his motion to suppress evidence which his then counsel filed on July 26, 2023 (Doc. #80).  That motion focused on the legality of the seizure of evidence from his residence at 4243 Hellerman Street in Philadelphia and on questions law enforcement asked Valdez regarding his immigration status.  My colleague, Judge John R. Padova, to whom the case was then assigned, held an evidentiary hearing on August 29, 2023.  The court granted in part and denied in part the motion on September 6, 2023.  U.S. v. Reyes-Valdez, No. CR 21-91-2, 2023 WL 5751109 (E.D. Pa. Sept. 6, 2023).[2]

The instant motion was not filed until July 1, 2024. Although titled a motion for reconsideration to suppress evidence, it concerns the substantive question not previously raised and decided as to whether the arrest of Valdez on October

---

1.   The parties have agreed to bifurcate the trial (Doc. #116). The count for illegal reentry will be tried after the jury has reached a decision regarding the other counts.
2.   This action was reassigned to the undersigned on June 27, 2024 (Doc. #168).

28, 2020 violated the Fourth Amendment.  If the arrest was illegal, Valdez maintains that the evidence of drugs and money later seized cannot be introduced against him.  None of the parties has requested a new evidentiary hearing.  They rest on the record made at the August 29, 2023 hearing before Judge Padova.

I

Philadelphia Police Officers Efran Torres and James Chabot testified at the August 29, 2023 hearing regarding the circumstances of Valdez's arrest.  Officer Torres was assigned as a member of Drug Enforcement Administration ("DEA") Task Force Group 25, which investigates narcotics suppliers.  Officer Chabot was assigned as a member of DEA Task Force Group 51, which investigates money laundering operations.  Judge Padova found the testimony of both witnesses to be credible.  U.S. v. Reyes-Valdez, 2023 WL 5751109 at *1-*3.

Around 1:03 PM on October 28, 2020, about 15 members of various DEA Task Forces were in the area of a parking lot of a Home Depot store at 4640 Roosevelt Boulevard in Philadelphia for a "kilo rip."  A kilo rip is a planned exchange of kilograms of drugs between a suspect and a confidential informant of the government.  Task Force Group 25, of which Officer Torres was a member, had been communicating with Co-defendant Otero who had offered to supply six kilograms of heroin.  The delivery of the

-3-

heroin was planned to take place at the above referenced time
and location.

Task force members were scattered around the Home
Depot parking lot and in a "staging area"—that is, a more
secluded location where task force members could gather, go over
the operation plan, and establish communications--located across
the street in the parking lot of the Friends Hospital.  Officer
Torres was dressed in plain clothes and situated at the staging
area.  The various law enforcement personnel in the Home Depot
parking lot and in the staging area were in constant
communication with each other.  A task force member in the Home
Depot parking lot was "calling out plate numbers and makes and
models of cars or individuals who otherwise may be associated
with [Otero]."

Otero arrived as expected at the Home Depot parking
lot.  Otero's vehicle was confirmed by its make and model, a
gray Mercury Mariner, and license plate number.  Otero was then
seen walking and conversing with another individual at the time
and place where the narcotics delivery was scheduled to occur.
A gray Ford Escape was parked close to Otero's car.

Officer Chabot and his partner were dressed in police
uniforms and sitting in a marked Philadelphia Police vehicle.
The vehicle was parked in the back driveway of the Home Depot
parking lot.  From that vantage point, Officer Chabot was able

to observe Otero and the other individual, who Officer Chabot identified at the hearing as Valdez.  Officer Chabot also recognized Valdez's car, the gray Ford Escape, which was parked near Otero's car.

Officer Chabot was familiar with Valdez from a separate ongoing investigation.  One month earlier, Task Force Group 51 had been investigating a large-scale Mexican money laundering operation.  The task force used confidential informants to conduct "money pickups," that is to transfer money to or from suspects.  Officer Chabot was responsible for street surveillance of money pickups.  He explained that his "main objective [was] to put a target down at a location."

Valdez was a target in this investigation.  On September 16, 2020, while Officer Chabot was conducting street surveillance for a planned pickup, he saw Valdez driving a gray 2009 Ford Escape to the pickup location.  Officer Chabot made a note of the vehicle's license plate number.  He saw the confidential informant enter Valdez's vehicle, receive just over $220,000 in cash from Valdez, and exit the vehicle.  The transaction took only a few minutes.  After it was completed, Officer Chabot followed Valdez to 4243 Hellerman Street.  He conducted periodic surveillance at that address for the remainder of September and in October.  He saw the gray Ford Escape in the vicinity of that address on several occasions.

-5-

Officer Chabot did not testify as to whether he communicated this information about Valdez in the moments leading up to his arrest on October 28, 2020.  In any event, the various task force members decided to take both Otero and Valdez, who were in the Home Depot parking lot, across the street to the staging area at the parking lot of the Friends Hospital.  They did so because the Home Depot parking lot was full of people and task members were concerned about revealing the identities of undercover officers who were also present. Bystanders began taking videos when law enforcement approached Otero and Valdez.  Task force members immediately placed the Defendants in handcuffs and transported them to the staging area, together with the Mercury Mariner (Otero's car) and the Ford Escape (Valdez's car).  Officer Chabot followed them to the staging area.

Officer Torres approached Valdez after he arrived at the Friends Hospital parking lot and asked him for identification.  Officer Torres testified that Valdez was not free to leave at that time:

> Q:  . . . At the time that [Valdez] was
> brought over to Friends Hospital, was he
> under arrest for anything?
>
> A:  No, sir.
>
> Q:  Was he detained?
>
> A:  Yes.

-6-

Q:  Was he handcuffed?

A:  He was.

Q:  Fair to say he was not free to leave?

A:  That's correct.

Valdez remained in handcuffs at the staging area and afterward when Officer Chabot and other task force members transported him to 4243 Hellerman Street for a subsequent search.

The events that followed were described in detail in Judge Padova's Memorandum.  <u>U.S. v. Reyes-Valdez</u>, 2023 WL 5751109 at *2-*3.

II

As a threshold matter, the Government argues that Valdez's motion for reconsideration should be denied because it is untimely.  The motion was filed 299 days after Judge Padova's September 6, 2023 decision granting in part and denying in part his motion to suppress evidence, 123 days after the appointment of Valdez's present counsel, and only 14 days before trial is scheduled to commence.

The court initially set deadlines for the filing of pretrial motions.  However, those deadlines were vacated in subsequent scheduling orders, which did not set any deadlines for pretrial motions.  Without any deadlines set by the court, counsel may file such motions at any time up to the start of trial.  <u>See</u> Fed. R. Crim. P. 12(c)(1).  While the pending motion

is certainly being presented at the eleventh hour, it is timely under the Rule 12(c)(1).

### III

The Government argues that the pending motion should be denied because it does not meet the criteria for reconsideration. Our Court of Appeals does not look with favor on such motions. It has explained that the purpose of a motion for reconsideration is to correct a clear error of law or to prevent a manifest injustice. E.g., United States v. Kalb, 891 F.3d 455, 467 (3d Cir. 2018). A motion for reconsideration is not a device to obtain a second bite at the apple.

Even though the current motion is titled a motion for reconsideration of a motion to suppress evidence, it raises an issue not previously raised that the arrest of Valdez was in violation of his Fourth Amendment rights. This specific issue was not previously argued and decided. Moreover, the motion is not untimely under any deadline set by the court or under Rule 12(c)(1). To the extent that the Government seeks to have the court deny the pending motion on the ground that it does not meet the standard for reconsideration, its argument fails.

### IV

The court now turns to the question of whether the arrest of Valdez was in violation of his Fourth Amendment rights.

Contrary to what Valdez and the Government seem to argue, Valdez was not subject to an investigative stop pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  Task force members observed Otero and Valdez walking and talking at the time of the planned exchange of heroin.  Task force members decided to take both Otero and Valdez across the street because the Home Depot parking lot was too crowded.  Although they intended only to detain Valdez and to later proceed with a formal arrest, they immediately placed him in handcuffs and transported him to another location where he was surrounded by police officers and DEA agents.  Valdez remained in handcuffs for over two hours before police began booking procedures.

Judge Padova found, and this court agrees, that "[Valdez] was <u>taken into police custody</u> placed in handcuffs in the parking lot of 4640 Roosevelt Boulevard at approximately 1:03 p.m." <u>U.S. v. Reyes-Valdez</u>, 2023 WL 5751109 at *6 (emphasis added).  From the start, Valdez was effectively placed under arrest.

The Fourth Amendment provides that people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  There is no evidence on the record that police had a warrant to arrest Valdez.  Accordingly, the Government must prove by a preponderance of the evidence that

-9-

the warrantless arrest of Valdez comported with the requirements of the Fourth Amendment—that is that police had probable cause. See, e.g., United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992).  Any evidence obtained by means of an unconstitutional search or seizure must be suppressed as "fruit of the poisonous tree."  E.g., United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).

Whether probable cause exists depends on whether an objective police officer upon viewing the historical facts had a reasonable ground for a belief of guilt.  Maryland v. Pringle, 540 U.S. 366, 370-72 (2003).  Probable cause depends on the totality of the circumstances.  Id. at 371.  It must also be particular to the individual defendant.  Id. at 373 (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). However, knowledge of the historical facts giving rise to probable cause is not particularized to the arresting officer.  Our Court of Appeals has held that the collective knowledge of law enforcement working together as a "unified and tight-knit team" can form the basis for probable cause.  See U.S. v. Whitfield, 634 F.3d 741, 746 (3d Cir. 2010); U.S. v. Belle, 593 F.2d 487 (3d Cir. 1979).

Officer Chabot was a member of the "unified and tight-knit team" that ultimately arrested Valdez.  See Whitfield, 634 F.3d at 746.  In the moments before the arrest, Officer Chabot

-10-

had identified Valdez as the individual who had given a
confidential informant $220,000 in cash as part of a money
laundering operation.  He further identified Valdez's gray Ford
Escape, the same vehicle which was used in the money laundering
operation.

Valdez cites United States v. Navedo in support of the
argument that his detention was in violation of his Fourth
Amendment rights.  694 F.3d 463 (3d Cir. 2012).  In Navedo,
police detectives were generally surveilling an area where a
shooting had occurred two months earlier.  During this
surveillance they saw an individual named Pozo approach
defendant Alexander Navedo carrying a bookbag.  Id. at 465.
Pozo took the bag off his shoulder, reached inside, and pulled
out what appeared to be a silver gun with a black handle.  Id.
Navedo leaned forward to see what was in the bag but never
touched the gun.  Id. at 465-66.  When the detectives approached
the group, Pozo threw the gun back into his bag and ran, while
Navedo separately ran up the stairs of the nearby building to
his apartment.  Id. at 466.  A detective pursued Navedo and
tackled him as he reached the apartment door.  Id.  Both men
fell through the open door into the apartment, where the
detective observed multiple guns and ammunition.  Id.

When Navedo was tackled, he was subject to a Terry
stop.  The Fourth Amendment permits such an investigative stop

if the police have reasonable suspicion to believe that criminal activity may be occurring. Terry, 392 U.S. at 30. Our Court of Appeals explained that reasonable suspicion for a Terry stop "is specific to the person who is detained." Id. at 468. It held that police "could not detain Navedo merely because their reasonable suspicions justified a brief investigative detention of Pozo." Id. The Court concluded that the police lacked reasonable suspicion to detain Navedo. Id. at 468-69.

Valdez argues that, like Navedo, he "was merely seen walking and talking with [Otero] in the busy parking lot in the middle of the afternoon." To the extent that police had probable cause to arrest Otero, according to Valdez, "there was absolutely nothing to tie Mr. Reyes-Valdez to that conduct—or any other—when he was seized."

There are significant differences in the circumstances surrounding Navedo's detainment and Valdez's arrest. Detectives simply spotted Navedo while conducting general surveillance of a neighborhood. Initially, neither Pozo nor Navedo were suspects in or targets of an investigation of criminal activity. In contrast, the various task force members saw Valdez at the exact time and location of a planned transaction involving six kilograms of narcotics. Valdez was conversing with the target of the task force investigation. His car was parked right by Otero's. Significantly, as previously discussed, Officer Chabot

-12-

had seen Valdez transfer over $220,000 in cash to a confidential informant in a money laundering investigation merely weeks before this planned narcotics exchange.

Under the totality of the circumstances, there were ample historical facts to establish probable cause.  See Maryland, 540 U.S. at 371.  The knowledge of Officer Chabot, as part of a joint task force, is attributable to the officers who arrested Valdez.  The reconsideration motion of Valdez to suppress evidence on the ground that his arrest was in violation of his Fourth Amendment rights will be denied.